IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

JAMES C. MILLER,

     Defendant.

CASE NO. 1:19-CR-00333-LMM-LTW

## FINAL REPORT AND RECOMMENDATION AND ORDER CERTIFYING THIS CASE READY FOR TRIAL

This matter is before the Court on Defendant James Miller's ("Defendant") Motion to Suppress Statements ([Docs. 15, 18]) and his third Motion for an Extension of Time to File his Reply ([Doc. 51]).  As an initial matter, Defendant's Motion for an Extension of Time to File his Reply is **GRANTED** *nunc pro tunc*.[1]  On June 8, 2020, the undersigned held a Jackson-Denno[2] hearing regarding Defendant's Motion to Suppress.  Defendant filed a post-hearing brief in support of the Motion ([Doc. 42]), the Government filed its Response in Opposition to the Motion ([Doc. 44]), and Defendant filed his Reply ([Doc. 52]).  For the reasons outlined below, the Court **RECOMMENDS** that Defendant's Motion to Suppress be **DENIED**.

---

[1] In the third Motion for an Extension of Time, Defendant requested "two (2) additional days."  [Doc. 51 at 1].

[2] Jackson v. Denno, 378 U.S. 368 (1964)

## BACKGROUND

Defendant is charged with one count of conspiracy to commit access device fraud, ten counts of access device fraud, and ten counts of aggravated identity theft. [Doc. 1].  Defendant also seeks to suppress statements he made to United States Secret Service Agents on the grounds that: (1) he was unlawfully detained, (2) his statements were not voluntary, and (3) he was not given a Miranda[3] warning before he made the statements.  [Doc. 42].

On June 13, 2019, Secret Service Special Agents Christopher Clinton and Clifford Stoner interviewed Defendant.  [Doc. 38 ("Tr.") at 3–4].  That day, Verizon Wireless ("Verizon") planned to conduct an interview of Defendant—one of its employees—regarding a scheme that involved stealing the personal identifying information of Verizon customers and "using that information to get new phones and then sending those out to people to resell."  [Id. at 4–5].  The agents were not involved in the Verizon interview, but did coordinate with Verizon so they could attempt to contact Defendant once the Verizon interview was over.  [Id.].  The agents waited in

---

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

the parking lot outside the Verizon store and, around 1:00 PM, were informed that Defendant was leaving the store.  [Id. at 5].

Defendant was followed into the parking lot by a Verizon employee, who was "having a conversation" with Defendant that the agents could not hear.  [Id. at 5, 14]. Defendant went to his car, and the agents "walked up to the vehicle, presented [their] credentials, [and] identified [them]selves as Special Agents [with the] United States Secret Service."  [Id. at 5].  When the agents approached, the Verizon employee "stepped off to the side," standing some ten to fifteen feet away.  [Id. at 7, 24–25].  "As [the agents] identified [themselves], [Defendant] exited the vehicle."  [Id. at 6].[4]  Agent Clinton told Defendant he "had some questions with regards to the Verizon matter" and asked Defendant if he would like to "go back inside the store to conduct [the] interview."  [Id.].  Defendant "stated he did not want to go back inside the store, but he would talk to [the agents] in the parking lot."  [Id.].  Agent Clinton admitted that he did not read Defendant any kind of Miranda warning.  [Id. at 19].

Defendant spoke with the agents for between six and ten minutes.  [Id. at 8]. Agent Clinton asked Defendant about his involvement in the alleged Verizon scheme,

---

[4] As will be discussed below, the parties dispute whether Agent Clinton asked Defendant to exit the vehicle or if Defendant did so without prompting.

and Defendant claimed to have engaged in fraud only a couple of times. [Id. at 10].

Agent Clinton responded that he had records from Verizon indicating Defendant "did

close to 60,000 dollars in fraud." [Id.]; see also [id. at 22]. Defendant then asserted

that a woman had gotten him involved in the fraud. [Id. at 10]. After hearing Defendant

describe the woman's involvement, Agent Clinton asked if Defendant would be willing

to come to the Secret Service office the next day for a more detailed interview, and

Defendant agreed. [Id. at 10, 23]. Agent Clinton gave Defendant his cellphone number

as Defendant got back in his vehicle, and Defendant then drove away. [Id. at 10–11,

22–23].

Agent Clinton was approximately three or four feet away while speaking with

Defendant. [Id. at 9, 11]. Agent Stoner, in turn, was five or six feet away from Agent

Clinton. [Id. at 7]. The agents did not draw their weapons during their conversation

with Defendant. [Id. at 7–8]. Nor did the agents place Defendant in handcuffs or tell

him he was under arrest. [Id. at 8]. The agents did not block Defendant's car, touch

Defendant, restrain his movement, or block Defendant's path to his car after he exited

the vehicle. [Id. at 7–9]. The conversation with Defendant took place in a normal tone.

[Id. at 8–9]. Agent Clinton was "not aggressive," and did not make any threats or

promises to Defendant. [Id. at 9]. The agents did not take Defendant's driver's license

or any identification.  [Id. at 9-10].  Defendant, for his part, was cooperative and seemed to understand what was going on.  [Id. at 9].

## DEFENDANT'S MOTION TO SUPPRESS

### A.    Whether Defendant was Unlawfully Detained

Defendant first argues that the agents detained him because "Agent Clinton asked [Defendant] to step out of the car" and then questioned Defendant without telling him he could refuse to answer the agents' questions.  [Doc. 42 at 7–8].  Defendant further argues the detention was unlawful because, although he "had come under investigation," the record lacks "a reasonable, objective basis for suspicion that [Defendant] had committed fraud against Verizon."  [Id. at 8].  The Government, in turn, argues that Defendant was not seized, in part, because "Agent Clinton's testimony does not show that he asked [Defendant] to step out of the car."  [Doc. 44 at 11–12].  But even if Agent Clinton did ask Defendant to step out of the car, the Government postulates, that would not be enough to "transform a consensual encounter into a seizure," considering the totality of the circumstances.  [Id. at 12–13].  In his reply, Defendant focuses exclusively on the issue of whether he was unlawfully seized in violation of the Fourth Amendment.  [Doc. 52].

A person is not "seized" within the meaning of the Fourth Amendment simply because they are questioned by law enforcement.  Miller v. Harget, 458 F.3d 1251, 1257 (11th Cir. 2006) ("Officers are free, without any level of suspicion, to approach citizens on the street or in a public place and ask them questions, request proof of identification, and a consent to search.").  Rather, a seizure occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen."  United States v. Baker, 290 F.3d 1276, 1278 (11th Cir. 2002) (quoting Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968)).  The test for determining whether the restrictions on a person's liberty is sufficient to constitute a seizure is whether "a reasonable person would [or would] not feel free to terminate the encounter with the police."  United States v. Street, 47 F.3d 1298, 1310 (11th Cir. 2006).  To determine whether a seizure has occurred, courts consider, but are not limited to, the following factors:

> whether a citizen's path is blocked or impeded; whether identification is retained; the suspect's age, education and intelligence; the length of the suspect's detention and questioning; the number of police officers present; the display of weapons; any physical touching of the suspect, and the language and tone of voice of the police.

United States v. De La Rosa, 922 F.2d 675, 678 (11th Cir. 1991).

6

Here, the evidence demonstrates that Defendant was not "seized" within the meaning of the Fourth Amendment.  Defendant notes that he was interviewed by Verizon before his encounter with the agents, but he cites—and the Court has found—no authority indicating that an encounter with law enforcement can be considered a "seizure" just because the individual was interviewed by his employer shortly before the encounter.  See [Doc. 52 at 3–4].  The interview with Verizon was over, and Defendant had left the store.  [Tr. at 4–5].  The fact that an unnamed Verizon employee was present some ten to fifteen feet away during Defendant's conversation with the agents did not transform the encounter into a seizure either.  The employee "stepped off" when the agents approached to speak with Defendant, and there is nothing in the record indicating he participated in the discussion in any way.  See [Id. at 24–25].  No reasonable person would feel they were "not feel free to terminate the encounter with the police" just because a Verizon employee is present in the same parking lot.  See Street, 47 F.3d at 1310.

Turning to Defendant's actual encounter with the agents, the fact that "two Secret Service agents walked up to [Defendant's] driver's side window and showed him their credentials" does not mean Defendant was detained.  See [Doc. 52 at 4].  The Secret Service agents decided to identify themselves as law enforcement by showing

their credentials because they were wearing plain clothes that covered up their guns and badges. [Tr. at 13]. Two plain-clothed law enforcement officers approaching and speaking with an individual "[does] not constitute a seizure for Fourth Amendment purposes," even if the officers exhibit credentials identifying them as law enforcement. United States v. Jordan, 635 F.3d 1181, 1187 (11th Cir. 2011).

The parties dispute what happened next. Defendant argues "Agent Clinton asked [him] to step out of the car." [Doc. 52 at 8]. The Government characterizes this statement as "factually flawed and legally irrelevant," and is right on both counts. See [Doc. 44 at 11]. Defendant is correct that, when asked "Did you ask [Defendant] to step out of the vehicle?"; Agent Clinton responded "Yes, sir." [Tr. at 18]. But the entirety of Agent Clinton's statement, and the rest of his testimony, indicate that he did not actually ask Defendant to step out of the car. When explaining what he said in his own words, Agent Clinton testified that he said, "Special Agent Christopher Clinton, United States Secret Service," when Defendant "was getting out of the car." [Id.]. This is consistent with Agent Clinton's earlier testimony regarding "exactly what [he] said," where Agent Clinton never indicated that he asked Defendant to exit the vehicle. [Tr. at 6]. Instead, Agent Clinton consistently testified that Defendant "exited the vehicle" while the agents "identified [themselves]." [Id.]; see also [id. at 17] (testifying that

Defendant "exited out of his vehicle and leaned in and looked at" the credentials Agent Clinton displayed while introducing himself); [id. at 19] (testifying that Defendant "got out of the car and looked at the creds" after Agent Clinton "identified [himself]"). The Court credits Agent Clinton's repeated testimony indicating Defendant exited the vehicle unprompted, even though it is ostensibly contradicted by one single word he said in response to a question posed by Defense counsel.

Even if Agent Clinton had asked Defendant to exit the vehicle, such "a directive" does not mean Defendant was seized, as Defendant claims. See [Doc. 52 at 4]. An individual is not detained just because law enforcement "direct[s]" him to do something. Jordan, 635 F.3d at 1187 (holding that the defendant was not seized even though the officers "direct[ed] the defendant . . . to get out of the middle of the street"). The Government cites to United States v. Debona, 759 F. App'x 892 (11th Cir. 2019) for the proposition that asking an individual to step out of his car "[does] not transform a consensual encounter into a seizure." [Doc. 44 at 12–13]. Defendant attempts to distinguish Debona, but his arguments are unpersuasive. See [Doc. 52 at 3–5].[5]

---

[5] Defendant correctly notes that Debona is not binding authority. [Doc. 52 at 5]. Notably, Debona was decided by a panel of the Eleventh Circuit, unlike the unreported decisions from other district courts that Defendant cites. See [id.]. For the reasons discussed herein, the undersigned finds Debona to be highly persuasive.

The fact that a Verizon employee was present in the parking lot hardly supports Defendant's argument that there "was a greater show of authority" in this case. See [Id. at 4–5]. A Verizon employee has no legal authority to compel Defendant to speak with authorities, and, in any event, the employee simply stood some ten to fifteen feet away and did not participate in the encounter. Other, more pertinent facts indicate there was a greater show of authority in Debona. 759 F. App'x at 894 (noting that both officers there were "in uniform" and approached the defendant in "marked squad car[s]").

Defendant also argues Debona is distinguishable "because there were two agents who approached [him] instead of one," but that is factually dubious. [Doc. 52 at 4]. In Debona, "two officers were present on the scene," although admittedly the officers approached the defendant one at a time. Debona, 759 F. App'x at 898; see also id. at 894. But the fact that the agents in this case approached simultaneously is a distinction without any meaningful difference. Unlike in Debona, there is no indication that both law enforcement officers questioned Defendant. See [Tr. at 21].

The only other fact Defendant points to distinguish <u>Debona</u> is that he "is an African-American male," while "Agent Clinton is a white male." [Doc. 52 at 4–5].[6] These facts do not actually distinguish <u>Debona</u> because that opinion does not indicate the race of any of the participants. Assuming without deciding that Defendant points to a meaningful distinction, it is not enough, when considering the totality of the circumstances, to render Defendant's encounter a seizure within the meaning of the Fourth Amendment.

As in <u>Debona</u>, the agents here "did not block [Defendant's car], ask for identification, activate . . . lights or sirens, brandish weapons, or use physical force." 759 F. App'x at 898; <u>see also</u> [Tr. at 7–9]. Even accepting Defendant's argument that Agent Clinton asked him to step out of his car, this fact does not distinguish <u>Debona</u>. <u>Debona</u>, 759 F. App'x 892, 894 (11th Cir. 2019) (holding the defendant was not seized even though an officer "asked [the defendant] if 'he would mind stepping out of the vehicle" to talk). Indeed, the officers in <u>Debona</u> did far more than simply ask the defendant to step out of his vehicle. When the second officer arrived on the scene, he "asked [the defendant] to walk over to his squad car to talk," but the Eleventh Circuit

---

[6] As Defendant concedes, there is no evidence in the record indicating Agent Stoner's race. [Doc. 52 at 4].

held that did not render the defendant "seized." Id. at 897. Nor did the fact that the officer repeatedly told the defendant "not to put his hands in his pockets" transform "what was a consensual encounter into a seizure." Id. at 898. The Debona Court noted that an officer's tone is important, and like in that case nothing in Agent Clinton's testimony "indicate[s] that he **ordered**" Defendant to get out of his vehicle or that he suggested "compliance with [his] request might be compelled." See id. (emphasis added) (quoting Kaupp v. Texas, 538 U.S. 626, 630 (2003)); see also [Tr. at 8–9, 18]. Like in Debona, Defendant's "encounter up to that point had been brief and non-coercive," and the fact Defendant never, "by words or actions, indicated that he wished to terminate the encounter" further indicates Agent Clinton's alleged request was not coercive. See Debona, 759 F. App'x at 898.

Considering the totality of the circumstances, the undersigned concludes that Defendant was never seized within the meaning of the Fourth Amendment. See De La Rosa, 922 F.2d at 678. Defendant's car and path to his car once he stepped out of the vehicle were never blocked. [Tr. at 7–9]. The agents never took Defendant's license or identification from him. [Id. at 10–11]. The detention at issue was brief, lasting only six to ten minutes. [Id. at 8]. The agents did not pull their weapons, touch Defendant, or tell him he was under arrest. [Id. at 7–8]. Agent Clinton's tone was

12

normal and "not aggressive," and he did not make any threats or promises to Defendant during the encounter. [Id. at 8–9]. What's more, even if Defendant had been seized, he would still not be entitled to suppression of his statements.

Law enforcement can briefly detain a person if they have a reasonable, articulable suspicion "that criminal activity 'may be afoot.'" United States v. Matchett, 802 F.3d 1185, 1192 (11th Cir. 2015) (quoting Terry, 392 U.S. at 30). The Court "must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." United States v. Hunter, 291 F.3d 1302, 1306 (11th Cir. 2002) (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)) (quotation marks omitted). Reasonable suspicion of criminal activity "requires a showing considerably less than preponderance of the evidence," but does "require[ ] at least a minimal level of objective justification for making the stop." Illinois v. Wardlow, 528 U.S. 119, 123 (2000).

Defendant makes the conclusory assertion that the "record does not demonstrate that there was reasonable, articulable suspicion to justify the detention," but he is incorrect. [Doc. 42 at 8]. The agents did not just randomly stumble upon Defendant. They went to the Verizon store where Defendant worked because they were investigating a scheme that involved stealing the personal identifying information of

Verizon customers and "using that information to get new phones and then sending those out to people to resell." [Tr. at 4–5]. Indeed, at the time the agents spoke with Defendant, they had "records from Verizon" indicating that Defendant "did close to 60,000 dollars in fraud." [Id. at 10]; see also [id. at 22].

The fact that Defendant had already completed the alleged crime does not preclude the agents from detaining him for questioning. The Supreme Court held that "if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a Terry stop may be made to investigate that suspicion." United States v. Hensley, 469 U.S. 221, 229 (1985); see also United States v. Cortez, 449 U.S. 411, 417 n.2 (1981) ("Of course, an officer may stop and question a person if there are reasonable grounds to believe that person is wanted for past criminal conduct."). To be sure, the "precise limits on investigatory stops to investigate past criminal activity are more difficult to define." Id. at 228. For example, the Eleventh Circuit has held that "the passage of time between [a defendant's] suspicious activity and the officers' seizure of him" can make the seizure unreasonable in "the complete absence of any contemporaneous observations" justifying the detention. United States v. Valerio, 718 F.3d 1321, 1325 (11th Cir. 2013).

But <u>Valerio</u> is readily distinguishable from the case at bar. First, the officers in <u>Valerio</u> had limited, stale evidence that the defendant had committed any offense at all. <u>See</u> 718 F.3d at 1322. All they knew was that the defendant went to a hydroponic equipment store, appeared "nervous[ ]" when followed by police—presumably because his vehicle lacked a license plate—and that he visited a warehouse. <u>Id</u>. When police investigated the warehouse, they "fail[ed] to find any evidence that [the defendant] was involved in a marijuana grow operation," as the police suspected. <u>Id</u>. at 1322–23. The second important distinction is with respect to the encounter between the defendant and law enforcement. In <u>Valerio</u>, the officers "blocked [the defendant's] exit from [his] driveway with their vehicle." <u>Id</u>. at 1323. An officer then approached the defendant "with his gun drawn and pointed in the direction of [the defendant], ordering him in a loud voice to get out of his truck." <u>Id</u>. As soon as the defendant stepped out of his vehicle, the officer "conducted a full-body pat-down search of [the defendant's] person and escorted him to the front of his truck," where he was questioned. <u>Id</u>.

Here, the agents had far more evidence Defendant had engaged in criminal conduct. As mentioned above, they had "records from Verizon" indicating that Defendant "did close to 60,000 dollars in fraud." [Tr. at 10]; <u>see also</u> [<u>id</u>. at 22]. Such evidence may have been enough to give the agents full probable cause. <u>See</u> <u>United</u>

States v. Blasco, 702 F.2d 1315, 1324 (11th Cir.1983) (holding that probable cause exists when officers "had reasonably trustworthy information" that is "sufficient to cause a person of reasonable caution to believe an offense has been or is being committed"). In this case, the information the agents had was enough to justify any limited intrusion that occurred in this case.

As the Hensley Court explained, because the issue is the "reasonableness" of the seizure, Courts must "balance[ ] the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion." 469 U.S. at 228. For example, in order to conduct a pat-down search, as occurred in Valerio, an officer needs a reasonable "belief that his safety or that of others was in danger" in addition to the reasonable suspicion of criminal conduct. Terry, 392 U.S. at 27. In the case at bar, to the extent there was any seizure of Defendant at all, the "nature and quality of the intrusion" was incredibly minimal. At worst, Defendant was "ask[ed]" to step out of his vehicle. See [Tr. at 18]. The agents did not "order[ ] him" to do so and did not use "a loud voice," like in Valerio. 718 F.3d at 1323. Nor did the agents block Defendant's vehicle, draw their weapons, point their weapons at Defendant, or "conduct[ ] a full-body pat-down search of [Defendant]," all of which happened in Valerio. Id.

As discussed above, the undersigned holds that the agents did not "seize" Defendant within the meaning of the Fourth Amendment.  But even if they had, the "nature and quality of the intrusion" was reasonable under the circumstances.  See Hensley, 469 U.S. at 228.

**B.      Whether Defendant's Statements were Voluntary**

Defendant next argues that he did not make "a free and deliberate choice to talk with [the] Agents."  [Doc. 42 at 10].  Specifically, Defendant contends there was "an element of coercion to the encounter" because he "wanted to leave, but the agents forced him to stay."  [Id. at 11].  Simply put, this argument has no basis in fact.  Agent Clinton told Defendant he "had some questions with regards to the Verizon matter that [he would] like to ask [Defendant]."  [Tr. at 38].  As discussed above, the agents did not seize Defendant or force him to do anything.  When Agent Clinton asked Defendant if he would "go back inside the store to conduct [the] interview," Defendant "stated he did not want to go back inside the store, but he would talk to [the agents] in the parking lot."  [Id.].  This exchange demonstrates that Defendant understood he could dictate the terms of any exchange he had with the officers, and the fact that the agents acquiesced shows they did not "force" Defendant to do anything.

A finding that Defendant's statements were involuntary turns on whether "the circumstances show that 'coercive police activity' overcame the defendant's free will." Arvelo v. Sec'y, Fla. Dep't of Corr., 687 F. App'x 901, 904 (11th Cir. 2017) (quoting Colorado v. Connelly, 479 U.S. 157, 163–64 (1986)). "Voluntariness is determined by an assessment of the totality of the circumstances, but that assessment must include an element of official overreaching to warrant a conclusion that a confession is involuntary under constitutional law." Miller v. Dugger, 838 F.2d 1530, 1536 (11th Cir. 1988). "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." Id.

No coercive conduct occurred during Defendant's conversation with the agents. The conversation itself lasted ten minutes at most, which can hardly be characterized as exhaustingly long. [Tr. at 8]. The agents did not pull their weapons, touch Defendant, or tell him he was under arrest. [Id. at 7–8]. Agent Clinton did not make any threats or promises to Defendant during the encounter. [Id. at 8–9]. Defendant's assertion that he was coerced because he "wanted to leave, but the agents forced him to stay" is unsupported. See [Doc. 42 at 11]. No one forced him to stay; Defendant willingly agreed to speak with the agents in the parking lot. [Tr. at 6]. As mentioned

above, the fact that Defendant refused to speak with the agents inside demonstrates that he understood he had the right to refuse to cooperate with law enforcement, contrary to his suggestion.  See [Doc. 42 at 11].

Even if the agents had "forced him to stay," that alone would not render Defendant's statements involuntary.  See, e.g., Arvelo v. Sec'y, Fla. Dep't of Corr., 687 F. App'x 901, 904 (11th Cir. 2017) (holding defendant's confession was voluntary even though he was under arrest and interrogated for three hours).  As will be discussed below, even if Defendant was "seized"—which he was not—he was not in custody, which bolsters the conclusion that his statements were voluntary.  See J.D.B. v. North Carolina, 564 U.S. 261, 268–69 (2011) ("Only those interrogations that occur while a suspect is in police custody, however, 'heighte[n] the risk' that statements obtained are not the product of the suspect's free choice.") (quoting Dickerson v. United States, 530 U.S. 428, 435 (2000)) (alteration in original).

The circumstances of this case are not the kind of coercive police conduct that would render Defendant's statements involuntary.  See, e.g., Mincey v. Arizona, 437 U.S. 385, 398–401 (1978) (holding a confession was involuntary where the hospitalized defendant was interrogated for four hours, even though he repeatedly asked the officer to stop until he could get a lawyer); Beecher v. Alabama, 389 U.S.

35, 36–37 (1967) (holding a confession obtained after the defendant was shot in the leg was involuntary because one of the officers threatened to kill the defendant and the other officer fired a rifle next to the defendant's ear). Looking at the totality of the circumstances, the Court concludes that the Government met its burden of establishing that Defendant's confession was voluntary and not the product of official overreaching. See United States v. Lall, 607 F.3d 1277, 1285 (11th Cir. 2010) ("The burden is on the prosecution to establish, by a preponderance of the evidence, that a challenged confession was voluntary.").

## C.    Whether Defendant was entitled to a *Miranda* Warning

Defendant's final argument, that he was entitled to a Miranda warning, turns on whether he "was in custody, because pre-custodial questioning does not require Miranda warnings." United States v. Street, 472 F.3d 1298, 1309 (11th Cir. 2006). Being "in custody" for Miranda purposes necessarily requires a greater restraint on a defendant's freedom than a mere "seizure." See United States v. Luna-Encinas, 603 F.3d 876, 881 (11th Cir. 2010) (holding that, "although a reasonable person in the defendant's position may feel constrained not to leave the scene of a police encounter at a particular moment—and thus may be deemed to have been 'seized' by law enforcement—he will not necessarily be considered in 'custody' for Fifth Amendment

purposes") (citing <u>Street</u>, 472 F.3d at 1310).  Because, as discussed above, Defendant was not "seized," he was most assuredly not "in custody" and thus was not entitled to a <u>Miranda</u> warning.

Even if Defendant had been "seized," this would not necessarily mean he was "in custody."  <u>Luna-Encinas</u>, 603 F.3d at 881.  When determining if a person is in custody, "the ultimate inquiry, based on the circumstances of each case, is whether there is a restraint on the suspect's freedom of movement 'of the degree associated with a formal arrest.'"  <u>United States v. Phillips</u>, 812 F.2d 1355, 1359 (11th Cir. 1987) (quoting <u>Minnesota v. Murphy</u>, 465 U.S. 420, 430, 104 S. Ct. 1136, 1144, 79 L. Ed. 2d 409 (1984)).  This is "an objective test," involving two discrete inquiries.  <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 653 (2004).  The Court examines the totality of the "circumstances surrounding the interrogation" and then decides, "given those circumstances, whether a reasonable person would have felt free to terminate the interrogation and leave."  <u>Id.</u>; see also <u>Thompson v. Keohane</u>, 516 U.S. 99, 112 (1995).  Courts consider numerous factors such as whether "the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled."  <u>United States v. Long</u>, 866 F.2d 402, 405 (11th Cir.1989); see also <u>Howes v. Fields</u>, 565 U.S. 499, 515 (2012) (holding that the

defendant was not "in custody" because, *inter alia*, he "was not physically restrained or threatened").

Defendant argues he was in custody, in part, because the agents "essentially stopped" his car "by approaching him, identifying themselves as federal agents, showing him their credentials and directing him to exit the car." [Doc. 42 at 12]. As discussed above, this is not factually accurate. Agent Clinton did not ask Defendant to exit the vehicle, and the agents did not "stop[ ]" Defendant from leaving because they in no way obstructed his vehicle. See [Tr. at 7]. Even if the agents had "stopped" Defendant, that would not mean he was in custody. Law enforcement officers routinely stop vehicles due to traffic offenses, approaching the car and identifying themselves as law enforcement. Sometimes, officers even ask people to step out of the vehicle during a traffic stop. But officers do not have to read citizens Miranda warnings during every traffic stop, because a mere traffic stop does not render a person "in custody."

Defendant contends that he was "being held under circumstances commensurate with an arrest" because Agent Clinton told him "the matter under investigation was a larger-scale fraud and that [Defendant] was a part of it." [Doc. 42 at 12–13]. Defendant cites, and the Court has found, no authority suggesting that merely telling a suspect he is under investigation for "substantial criminal conduct" entitles that person to a

Miranda warning. See [id.].  Under the totality of the circumstances, the undersigned concludes Defendant was not "in custody," and thus was not entitled to a Miranda warning before the agents questioned him.  See Street, 472 F.3d at 1309.  The agents did not brandish their weapons, touch Defendant, or use language or a tone that indicated compliance could be compelled.  See [Tr. at 5–9]; see also Long, 866 F.2d at 405.  Nor did the agents physically restrain or threaten Defendant.  See [Tr. at 5–9]; see also Howes, 565 U.S. at 515.  The agents simply indicated they would like to speak with Defendant, and he agreed.  [Tr. at 6].  Because Defendant's statements were freely and voluntarily given at a time when he was neither "seized" nor "in custody," the undersigned **RECOMMENDS** that Defendant's Motion to Suppress be **DENIED**.

## CONCLUSION

As discussed above, Defendant's Motion for an Extension of Time to File his Reply ([Doc. 51]) is **GRANTED** *nunc pro tunc*.  And for the foregoing reasons, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress Statements ([Docs. 15, 18]) be **DENIED**.  There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.  **IT IS FURTHER ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Certified Ready for Trial.

23

**SO ORDERED, REPORTED, AND RECOMMENDED**, this  5  day of November, 2020.

LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE